UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

THOMAS HALKETT,                )
                              )
            Plaintiff,         )
                              )
      v.                      )          1:09-cv-00637-JAW
                              )
CORRECTIONAL MEDICAL          )
SERVICES, INC.,               )
                              )
            Defendant.         )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Concluding that an employee has raised sufficient evidence to withstand a motion for summary judgment under the Maine Whistleblowers Protection Act (MWPA), the Court denies the employer's motion for summary judgment.

## I.    STATEMENT OF FACTS

### A.    Procedural History

On November 30, 2009, Thomas Halkett filed suit in Penobscot County Superior Court against his former employer, Correctional Medical Services, Inc. (CMS), alleging that CMS violated the Maine Whistleblower Protection Act (MWPA), 26 M.R.S. § 831 *et seq.*, and the Maine Human Rights Act (MHRA), 5 M.R.S. 4551 *et seq.*, by terminating his employment after he complained to CMS about its practices, which he reasonably believed were illegal.  *Notice of Removal* (Docket # 1) Attach. 1 (*Compl.*).  On December 22, 2009, CMS removed the action to this Court based on its diversity jurisdiction.  *Notice of Removal.*  On June 22, 2010, CMS moved for summary judgment.  *Def.'s Mot. for Summ. J.* (Docket # 16) (*Def.'s*

*Mot.*).  On August 16, 2010, Mr. Halkett responded.  *Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ J.* (Docket # 23) (*Pl.'s Opp'n*).  On August 30, 2010, CMS replied.  *Def.'s Br. in Reply to Pl.'s Objection to Def.'s Mot. for Summ. J.* (Docket # 27) (*Def.'s Reply*).

### B.    Preliminary Objections

### 1.    CMS's Objection to Plaintiff's Statement of Material Fact Paragraph 155

In its Reply to Mr. Halkett's Statement of Additional Material Facts, CMS objects to paragraph 155 on the ground that it violates Local Rule 56(c) by positing "two distinct statements of fact each with a distinct record citation."  *Def.'s Am. and Corrected Reply to Pl.'s Statement of Additional Material Facts* ¶ 155 n.1 (Docket # 29) (DRPSAMF).  *See* D. ME. LOC. R. 56(c).  Local Rule 56(c) requires that a party opposing a motion for summary judgment submit with its opposition "a separate, short, and concise statement of material facts."  D. ME. LOC. R. 56(c).  It allows the opposing party to submit additional facts, "each set forth in a separately numbered paragraph and supported by a record citation."  *Id.*  At the same time, the Court does not require that each paragraph contain only a single assertion.  *Randall v. Potter*, 366 F. Supp. 2d 120, 122 (D. Me. 2005) ("[T]he requirement of 'separately numbered paragraphs' does not mean each paragraph must contain only one sentence."); *Capozza Tile Co. v. Joy*, 223 F. Supp. 2d 307, 313 n.2 (D. Me. 2002) (denying a motion to strike a statement of material facts "replete with multiple allegations set forth in the same numbered paragraph" because a response "would not be unduly burdensome").  The Court has reviewed Plaintiff's paragraph 155 and

has concluded that it does not violate Local Rule 56(c). The Court overrules CMS's objection to Plaintiff's Statement of Additional Material Fact paragraph 155.

### 2. CMS Objections to Background Facts

In his Statement of Additional Material Facts, Mr. Halkett provided some of his educational and professional background. *Pl.'s Statement of Additional Material Facts* ¶¶ 150-51 (Docket # 22) (PSAMF). CMS objects on the basis that his background and experience is not material to the motion. DRPSAMF ¶¶ 150-51. The Court overrules CMS's objection.

### C. Thomas Halkett and CMS

### 1. Thomas Halkett's Background and Employment

Thomas Halkett is a licensed clinical professional counselor with a bachelor of arts degree in philosophy and a master's degree in divinity. PSAMF 150; DRPSAMF ¶ 150. Mr. Halkett has maintained a private counseling practice since the late 1980s, has been employed as an assistant professor of philosophy at the University of Maine at Machias since 1994, and had worked as a vicar at St. Aidan's Episcopal Church in Machias, Maine. PSAMF ¶ 151; DRPSAMF ¶ 151. Mr. Halkett worked with inmates at the Washington County Jail from 1985 to the mid-1990s. PSAMF ¶ 152; DRPSAMF ¶ 152. In January 2004, Mr. Halkett gave up his position as vicar at St. Aidan's.[1] PSAMF ¶ 153; DRPSAMF ¶ 153. Mr. Halkett has

---

[1] Mr. Halkett's statement of additional material fact paragraph 153 states that he gave up his position at St. Aidan's in November 2003 and cites page 11 of his deposition. PSAMF ¶ 153. CMS posited a qualified response, noting that Mr. Halkett actually testified on page 11 that he gave up his vicar position in January 2004. DRPSAMF ¶ 153. CMS is correct. The reference to November 2003 on page 11 of Mr. Halkett's deposition is to the time he began working at CMS, not the time he left St. Aidan's. *Def.'s Statement of Undisputed Material Facts* (Docket # 15) (DSMF) Attach. 1, *Deposition of Thomas Halkett*, 11:6-22 (*Halkett Dep.*). The Court has used the January 2004 date.

some background on inmate confidentiality through his experience and his work as a professor.[2]  PSAMF ¶ 154; DRPSAMF ¶ 154.

### 2.  Mr. Halkett, C.M., and the Telephone

In March 2006, Mr. Halkett was allowing inmates to make telephone calls from his office to people outside the prison.  DSMF ¶ 71; *Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts* ¶ 71 (Docket # 22) (PRDSMF).  Specifically, Mr. Halkett was treating an inmate, "C.M.," for mental health issues.  DSMF ¶ 72; PRDSMF ¶ 72.  During this same time, Carol Geel, a licensed social worker and correctional caseworker for the Maine Department of Corrections (MDOC) at the Downeast Correctional Facility (DCF), was C.M.'s MDOC caseworker.  DSMF ¶¶ 72-73; PRDSMF ¶¶ 72-73.  Ms. Geel believed that C.M. had been convicted of domestic abuse and was a batterer who had remained obsessed about his girlfriend's whereabouts, and Ms. Geel had refused to authorize C.M.'s requests to telephone his girlfriend.[3]  DSMF ¶¶ 75-78; PRDSMF ¶¶ 75-78.

In March 2006, Mr. Halkett allowed C.M. to telephone his girlfriend from Mr. Halkett's office because C.M. was not allowed to make calls from Ms. Geel's office and because C.M. had no telephone of his own.  DSMF ¶ 79; PRDSMF ¶ 79.  Mr.

---

[2] CMS posited a qualified response to this statement, noting that Mr. Halkett did not testify that he taught confidentiality issues and that he testified that he had reviewed only one student paper on HIPAA and inmate protection.  DRPASMF ¶ 154.  CMS's qualified response does not contradict Mr. Halkett's statement of material fact paragraph 154.

[3] Mr. Halkett denied that C.M. had been convicted of domestic assault and objected to Ms. Geel's characterization of C.M. as hearsay, speculation, and impermissible expert testimony.  PRDSMF ¶¶ 75-78.  Mr. Halkett affirmatively states that C.M. was allowed to see his girlfriend and to receive mail and phone calls from her.  *Id.* ¶¶ 77-78.  The Court cannot know based on this record whether C.M. had been previously convicted of domestic assault, but whether Ms. Geel thought he had been so convicted and whether she believed he should not have contact with his girlfriend are not being submitted for the truth.  Rather these facts explain CMS's response to Mr. Halkett's decision to allow C.M. to contact his girlfriend.  The Court therefore overrules Mr. Halkett's denial of paragraph 75 and his qualified responses to Defendant's Statement of Material Facts paragraphs 76 through 78.

Halkett believed that there were no MDOC regulations that prohibited these calls. DSMF ¶ 80; PRDSMF ¶ 80.

In the spring of 2006, Ms. Geel learned that Mr. Halkett had allowed C.M. to contact his girlfriend.[4] DSMF ¶ 81; PRDSMF ¶ 81; PSAMF ¶ 155; DRPSAMF ¶ 155. Ms. Geel believed that by allowing C.M. to telephone his girlfriend, Mr. Halkett was violating MDOC policy, and she notified Ralph Pennell, the Programs Manager at DCF, that she believed that Mr. Halkett had violated MDOC Policy 21.3. DSMF ¶¶ 85, 93–94; PRDSMF ¶¶ 85, 93. Ms. Geel considered Mr. Halkett's actions to be particularly serious because he had allowed an inmate who had been convicted of domestic assault to telephone his victim.[5] DSMF ¶ 86; PRDSMF ¶ 86.

In March 2006, Mr. Halkett thought it was entirely appropriate for C.M. to initiate telephone calls to his girlfriend. DSMF ¶ 91; PRDSMF ¶ 91. During the winter of 2006, Mr. Halkett believed that if he thought it was appropriate to do so, in certain circumstances, such as where there were family issues, where someone was incredibly distraught, or occasionally if the person needed to speak to a lawyer, inmates could place telephone calls from his office. DSMF ¶ 87; PRDSMF ¶ 87. He also believed that if a person outside prison was on an inmate's visiting list, and if

---

[4] In its statement of material fact, CMS says that MDOC Policy 21.3 applied to Mr. Halkett and that Ms. Geel considered Mr. Halkett's allowing C.M. to make calls to his girlfriend without obtaining Ms. Geel's permission to be a violation of Policy 21.3. DSMF ¶¶ 82-84. Mr. Halkett denied these statements of material fact. PRDSMF ¶¶ 82-84. Mr. Halkett has admitted, however, that Ms. Geel notified Ralph Pennell about C.M.'s telephone call and about her belief that Mr. Halkett had violated MDOC prisoner telephone usage policy. DSMF ¶ 85; PRDSMF ¶ 85. The Court considers CMS's statements of material fact paragraphs 82-84 not for their truth, but as background to explain why Ms. Geel took the action Mr. Halkett concedes she took.

[5] Mr. Halkett objected to this statement of material fact on the ground that Ms. Geel was not the decision-maker so her opinions were irrelevant. PRDSMF ¶ 86. The Court overrules his objection. The Court does not accept Ms. Geel's belief for its truth but to explain what CMS did as a consequence.

that person sent mail to the prisoner, the inmate faced no restrictions against initiating telephone calls to that person so long as the inmate was "not in a domestic violence situation." DSMF ¶ 89; PRDSMF ¶ 89. Although C.M.'s girlfriend was on an approved list of his visitors, whether she visited him was her decision, based exclusively on her initiation, and as a result of Mr. Halkett's actions, although she could have terminated the conversation by hanging up, the girlfriend did not have the same freedom of choice with respect to telephone calls initiated by C.M.[6] DSMF ¶ 90; PRDSMF ¶ 90.

### 3. June 2006: MDOC Informs Mr. Halkett About Its Inmate Telephone Policy

After learning about Mr. Halkett and C.M., on June 20, 2006, Mr. Pennell prepared a memorandum and submitted it to Mr. Halkett. DSMF ¶ 93; PRDSMF ¶ 93. MDOC Policy 21.3, which had an effective date of May 14, 2002, covers the right of inmates to make telephone calls to persons outside the prison. DSMF ¶ 94, 96; PRDSMF ¶ 94, 96. Mr. Halkett says, however, that there is a separate MDOC policy that defines rules for when a mental health worker can place a phone call on behalf of an inmate.[7] PRDSMF ¶ 94, 98. When Mr. Pennell informed Mr. Halkett

---

[6] Mr. Halkett objects to this statement on the ground that Ms. Geel was not a decisionmaker and her opinions are irrelevant. PRDSMF ¶ 90. The Court overrules Mr. Halkett's objection.

[7] Mr. Halkett posited a qualified response to this statement of material fact on the ground that there is another MDOC policy that "defines rules for when a mental health worker can place a phone call on behalf of an inmate." *Id.* ¶ 94. In support of his qualified response, Mr. Halkett cites his own deposition in which he testified that there is a separate written MDOC policy, which is contained in the MDOC binder. *Id.* (citing *Halkett Dep.* at 190:11-25, 191:1).

In its reply to Mr. Halkett's similar response to statement of material fact paragraph 98, CMS says that "[n]o such MDOC policy has been offered by Mr. Halkett for the Court's review, nor does any such policy appear in the discovery record." DRPSAMF ¶ 98. It goes on to say that "[n]o admissible documentary evidence has been offered to support Mr. Halkett's qualification in this Response, or to support the statement offered in Mr. Halkett's deposition on this issue." *Id.* At this stage, the Court is required to view the record in the light most favorable to Mr. Halkett and therefore will take his

in June 2006 that he was restricted from placing phone calls on behalf of inmates, this policy was contrary to what Mr. Halkett believed the MDOC allowed. PRDSMF ¶ 97.  Mr. Halkett believes that restrictions went into place in June or July 2006 following the episode involving C.M.[8]  DSMF ¶ 97; PRDSMF ¶ 97.  As of late June 2006, Mr. Halkett understood that he was not to make any telephone calls for inmates from his office or to allow prisoners to make any telephone calls from his office.  DSMF ¶ 101; PRDSMF ¶ 101.  However, Mr. Halkett wrote a written response to Mr. Pennell's memorandum, citing a MDOC policy that allowed mental health workers to assist prisoners to facilitate contact with family and outside agencies when necessary.[9]  PSAMF ¶ 157; DRPSAMF ¶ 157.

Kimberly Partridge, who was Mr. Halkett's direct supervisor at CMS, did not discipline Mr. Halkett for the incident involving C.M. but she issued a memorandum.  DSMF ¶ 103; PRDSMF ¶ 103; PSAMF ¶ 159; DRPSAMF ¶ 159. Although Ms. Partridge considered the memorandum a counseling step, the memorandum itself does not say it was intended as a counseling step and Ms. Partridge did not consider it to be a written warning.  DSMF ¶ 103; PRDSMF ¶ 103.

4.  **October 26, 2007:  Mr. Halkett Facilitates An Inmate Telephone Call From His Office**

---

assertion at face value.  Whether MDOC has such a written policy is presumably ascertainable.  If it does not, Mr. Halkett and his counsel will owe this Court an explanation.

[8] Mr. Halkett posited a qualified response, stating that it was in June 2006 that Mr. Pennell informed Mr. Halkett that he was so restricted.  PRDSMF ¶ 97.  Although Mr. Halkett testified in his deposition that the restrictions took effect in June or July 2006, *Halkett Dep.* 184:22-24, Mr. Halkett later admits that he learned about these restrictions in late June 2006.  DSMF ¶ 101; PRDSMF ¶ 101.

[9] CMS posited a qualified response to this statement of material fact, emphasizing that Mr. Halkett understood that the DCF inmate telephone policy applied to him.  DRPSAMF ¶ 157.  Mr. Halkett has admitted his understanding to this effect.  DSMF ¶ 101; PRDSMF ¶ 101.

On October 26, 2007, Mr. Halkett allowed an inmate, "A.B.," whom he had been treating, to leave a voicemail message with his probation officer, Christopher Arbour, from Mr. Halkett's office at DCF. DSMF ¶¶ 104, 106; PRDSMF ¶¶ 104, 106. A.B.'s voicemail to Probation Officer Arbour informed the Officer that A.B. would contact his supervisor if he did not return the call.[10] DSMF ¶ 106; PRDSMF ¶ 106. On Monday, October 29, 2007, Officer Arbour listened to A.B.'s voicemail and he returned A.B.'s call and explained that he could not do any probation planning for him while he remained incarcerated; however, Officer Arbour then contacted MDOC officials at DCF and complained about having received a call from A.B. DSMF ¶¶ 106, 107; PRDSMF ¶¶ 106, 107.

In late October 2007, Ms. Partridge became aware of the telephone incident involving A.B. from Mark Caton, the Director of the DCF, and from Mr. Pennell on October 30, 2007.[11] DSMF ¶ 105; PRDSMF ¶ 105. On October 30, 2007, Ms. Partridge emailed Larry Amberger, CMS's regional director, about Mr. Halkett's actions and the telephone incident. DSMF ¶ 108; PRDSMF ¶ 108. In mid-November 2007, Mark Caton mentioned the telephone incident to Ms. Partridge

---

[10] Mr. Halkett objects to the content of the voicemail as hearsay. PRDSMF ¶ 106. The Court overrules the objection since the content of the message is not being considered for its truth but for background to explain how Mr. Halkett's action came to the attention of the prison officials at DCF and Mr. Halkett's supervisors at CMS.

[11] CMS says in its statement of material fact paragraph 105 that Ms. Partridge first became aware of the incident involving A.B. on October 30, 2007 from Mr. Pennell. DSMF ¶ 105. CMS cites Ms. Partridge's deposition errata sheet and her affidavit. *Id.* Ms. Partridge's errata sheet, however, says that she was informed about the incident by Mark Caron, who was the director of DCF. DSMF Attach. 25, *Dep. of Kim Partridge,* at 94 (*Partridge Dep.*). Ms. Partridge's affidavit says that Mr. Pennell advised her about the incident on October 30, 2007, but it does not say that this was her first knowledge. DSMF Attach. 27 *Aff. of Kimberly Partridge*, ¶ 6. Mr. Halkett posited a qualified response to this statement of material fact, simply citing Ms. Partridge's deposition transcript at page 64. Putting this altogether, the Court concludes that Ms. Partridge heard about this incident from Mark Caron and on October 30, 2007 from Mr. Pennell.

and asked her to investigate what had happened. DSMF ¶ 109; PRDSMF ¶ 109. Mr. Caton further informed Ms. Partridge that he did not want Mr. Halkett on DCF grounds until she had completed her investigation. DSMF ¶ 110; PRDSMF ¶ 110. Mr. Caton decided to lock Mr. Halkett out of the DCF, an action that is within Mr. Caton's authority. DSMF ¶¶ 110-11; PRDSMF ¶¶ 110-11. Mr. Caton was aware that Mr. Halkett had violated the DCF's telephone policy previously. DSMF ¶ 112; PRDSMF ¶ 112.

Mr. Halkett was away for a two-week leadership training session but upon his return on November 15, 2007, Ms. Partridge notified him that allowing A.B. to leave a voicemail message was unacceptable and that CMS was "not sure that [Halkett] would be allowed to work [at DCF] anymore." DSMF ¶ 114; PRDSMF ¶114. Ms. Partridge made it clear to Mr. Halkett that she was investigating the telephone incident involving A.B. and she asked him to prepare a written statement. DSMF ¶ 115; PRDSMF ¶ 115. During their conversation, Ms. Partridge gave Mr. Halkett an opportunity to clarify whether he had allowed an inmate to make a telephone call or whether he had helped the inmate make a call from his office. DSMF ¶ 116; PRDSMF ¶ 116. Mr. Halkett responded that he had not allowed A.B. to make the phone call, but he had dialed the number and A.B. had left a message.[12] DSMF ¶ 117; PRDSMF ¶ 117.

Ms. Partridge prepared a memorandum dated November 15, 2007, following her conversation with Mr. Halkett. DSMF ¶ 118; PRDSMF ¶ 118. She also called

---

[12] CMS says that Mr. Halkett denied calling a probation officer for an inmate or allowing the inmate to make the call. DSMF ¶ 117. Mr. Halkett denied making this statement, PRDSMF ¶ 117, and the Court considers the evidence in the light most favorable to him.

Mr. Caton on November 15, 2007, and told him that Mr. Halkett denied making a call to a probation officer or allowing A.B. to make the call.[13]  DSMF ¶ 119; PRDSMF ¶ 119.  Mr. Caton lifted the lockout of Mr. Halkett based on Ms. Partridge's reporting that Mr. Halkett denied calling the probation office or allowing an inmate to do so.  DSMF ¶ 120; PRDSMF ¶ 120.

After reviewing his progress notes, Mr. Halkett recalled that A.B. had come to him on October 26, 2007, and was extremely agitated, frightened, and obsessed about his pending release from prison.  PSAMF ¶ 190; DRPSAMF ¶ 190.  A.B. was very worried about where he was going to live and was very fearful that his probation officer was out to get him and would move quickly to revoke his probation.  *Id.*  Mr. Halkett was very concerned about A.B.'s mental state and the potential for A.B. to become violent.  PSAMF ¶ 191; DRPSAMF ¶ 191.  He therefore made the decision that it would be of great therapeutic value for Mr. Halkett to call A.B.'s probation officer in A.B.'s presence to attempt to assuage A.B.'s concerns.  PSAMF ¶ 192; DRPSAMF ¶ 192.

Mr. Halkett prepared a written statement about the A.B. telephone incident and submitted it to her on November 16, 2007.  DSMF ¶ 122; PRDSMF ¶ 122.  In the statement, Mr. Halkett conceded that he:

> suggested that [A.B.] talk with Linda (caseworker) and that I could call his probation officer to discuss mental health concerns.  [A.B.] asked if he could talk with him, I said no.  I said it would be good for him to let his probation officer know what he needed in a letter.  Meanwhile, I

---

[13] Mr. Halkett denies this statement, asserting he had never denied that he dialed a phone number for A.B. and allowed A.B. to leave a message on the Officer's voicemail.  PRDSMF ¶ 119.  The Court still accepts this statement over Mr. Halkett's denial because even if he never made these denials, Ms. Partridge may still have told Mr. Caton that he made the denials.

called the probation office, and when got the answering machine asked [A.B.] if he would like to leave a message. He left a very coherent, polite message that expressed some of the concerns that we had been discussing.

DSMF ¶ 123; PRDSMF ¶ 123. He went on to write that "once in a while for therapeutic reasons, I have pushed the edge on this phone call prohibition," but he emphasized that these instances are "exceptional and from an institutional point of view, may be security problems, or in the parlance of our institution, disobeying a direct order. But I don't think so and would enjoy talking with you and Mark about that." DSMF ¶¶ 124-25; PRDSMF ¶¶ 124-25. He thought that allowing A.B. to leave a voicemail message was completely different from allowing A.B. to make a phone call, and that he had not violated the spirit of Mr. Pennell's June 20, 2006 letter. DSMF ¶ 126; PRDSMF ¶ 126. At the same time, he conceded that allowing A.B. to leave a voicemail message with a probation officer "was somewhat inconsistent" with the June 20, 2006 directive; yet, he thought "it was not inconsistent with [his] role as a mental health professional at that facility." DSMF ¶ 127; PRDSMF ¶ 127. Mr. Halkett insisted that as a mental health professional, it was "his call to make" and believed that the inmate felt better and was less disruptive. DSMF ¶ 128-29; PRDSMF ¶ 128-29.

### 5. CMS Terminates Mr. Halkett

Mr. Halkett understood from his first conversation with Ms. Partridge that CMS considered what he had done to be very serious, and in fact, Ms. Partridge informed him that he might be terminated. DSMF ¶ 130-31; PRDSMF ¶ 130-31. She told Mr. Halkett that he was being "locked out" of the DCF because of the A.B.

telephone incident. DSMF ¶ 132; PRDSMF ¶ 132. On December 5, 2007, Ms. Partridge recommended to Mr. Amberger and CMS's Human Resources representative that Mr. Halkett be terminated. DSMF ¶ 138-39; PRDSMF ¶ 138-39. Ms. Partridge consulted with Sterling Price, a human resources specialist, who only indicated that the conduct was "terminable," and with her superior, Mr. Amberger. PSAMF ¶ 204; DRPSAMF ¶ 204.

Mr. Amberger accepted Ms. Partridge's recommendation to terminate Mr. Halkett. DSMF ¶ 141; PRDSMF ¶ 141. On December 7, 2010, Ms. Partridge called Mr. Halkett and told him that CMS was terminating him because of the A.B. incident. DSMF ¶ 143-44; PRDSMF ¶ 143-44. Mr. Halkett believes that CMS applied the telephone policy selectively against him, since he was told by Patty Murphy, a fellow counselor, that she had been allowing inmates to make phone calls from her office ever since she started working there.[14] PSAMF ¶ 158; DRPSAMF ¶ 158. CMS has a corrective action policy that was in effect during Mr. Halkett's employment. PSAMF ¶ 195; DRPSAMF ¶ 195. The policy provided for progressive discipline, beginning with verbal counseling, written counseling, final written warning, and a recommendation for termination.[15] PSAMF ¶ 195; DRPSAMF ¶ 195.

### D.  Thomas Halkett and Whistleblowing

[14] CMS objected to Ms. Murphy's statements as hearsay. DRPSAMF ¶ 158. The Court considers Ms. Murphy's statements not for their truth but to explain Mr. Halkett's belief that he had been singled out.

[15] CMS posited a qualified response, noting that even though it had a policy of progressive discipline, it reserved the right to "take progressive disciplinary action or to immediately terminate employment if appropriate." DRPSAMF ¶ 195. This additional information does not contradict Mr. Halkett's statement of material fact paragraph 195.

### 1.  October 2006:  Missing Records

In October 2006, Mr. Halkett became aware that his counseling records for an inmate, Brian, were missing from Brian's chart.  PSAMF ¶ 159; DRPSAMF ¶ 159.  Mr. Halkett expressed his concern about the missing records to Ms. Partridge, particularly since the absence of treatment records for an inmate who was required to undergo mental health treatment could adversely affect the inmate.[16]  PSAMF ¶ 159; DRPSAMF ¶ 159.  Mr. Halkett told Ms. Partridge that he believed that both state and federal law require that counseling records be kept in an identifiable secure location.[17]  PSAMF ¶ 160; DRPSAMF ¶ 160.  He believed that the failure of security and confidentiality of the records was illegal and he assumed that HIPAA had made such tampering or destruction of records illegal.  PSAMF ¶ 160; DRPSAMF ¶ 160.

### 2.  Fall of 2006:  D.B.'s Missing Records

In the fall of 2006, Mr. Halkett also became aware that a letter he had written for an inmate, "D.B.," concerning his progress in counseling with a goal to gain minimum security status within DCF, was missing from D.B.'s file.  PSAMF ¶ 161; DRPSAMF ¶ 161.  Mr. Halkett had given D.B. a copy of the letter and D.B. told him that his cell had been searched and the letter was missing from his cell after

---

[16] CMS denied this statement, saying that Ms. Partridge has no recollection of the conversation. DRPSAMF ¶ 159.  However, the Court is required to view the record in the light most favorable to the Plaintiff.
[17] CMS denies this statement, saying that Ms. Partridge has no recollection of the conversation. DRPSAMF ¶ 160.  However, the Court is required to view the record in the light most favorable to the Plaintiff.

the search was completed.[18]  PSAMF ¶ 161; DRPSAMF ¶ 161.  Mr. Halkett placed a

copy of that letter in D.B.'s chart but discovered that the letter and treatment notes

had been removed from D.B.'s chart.  PSAMF ¶ 162; DRPSAMF ¶ 162.  It was Mr.

Halkett's hypothesis that the letter had been purposefully removed and destroyed.

*Id.*

### 3.    Ms. Partridge Responds

When Mr. Halkett brought these missing records to Ms. Partridge's attention,

she suggested that the missing records for both Brian and D.B. were only a problem

of misfiling, not intentional removal.  PSAMF ¶ 163; DRPSAMF ¶ 163.  Mr. Halkett

felt he had never received a satisfactory explanation for why the records were

missing.  *Id.*

### 4.    Spring 2007:  Mr. Halkett Complains Again

In the spring of 2007, Mr. Halkett emailed Ms. Partridge regarding a breach

of confidentiality involving counseling records, which Mr. Halkett considered a

violation of state and federal law.  PSAMF ¶ 164; DRPSAMF ¶ 164.

### 5.    Board of Nursing Complaints Against Kimberly Partridge and Michelle Snow and Mr. Halkett's Complaint

Mr. Halkett claims that "W.B.," an inmate, had filed complaints with the

Board of Nursing against Ms. Partridge and Michelle Snow over their mishandling

of a confidential medical discussion as well as other issues, including allowing a

---

[18] CMS posited a qualified response to statement of material fact paragraph 161 on the ground that D.B.'s statements to Mr. Halkett are hearsay.  DRPSAMF ¶ 161.  The Court does not treat these statements as true.  Rather they go to the reasonableness of his belief that he had been terminated due to his whistleblowing.

known narcotics addict to inject his own medicine.[19]  PSAMF ¶ 165; DRPSAMF ¶ 165.  Mr. Halkett believed that Ms. Partridge and Ms. Snow had been reviewing his counseling notes concerning W.B., not in an effort to assist his mental health concerns, but to gain information, such as W.B.'s mood or personality disorders, to defend against W.B.'s complaint.[20]  PSAMF ¶ 166; DRPSAMF ¶ 166.  Mr. Halkett says that there was no legitimate reason for either Ms. Partridge or Ms. Snow to examine Mr. Halkett's treatment notes of W.B. for the purpose of preparing a defense to W.B.'s Nursing Board complaint.[21]  PSAMF ¶ 167; DRPSAMF ¶ 167.  He contended that the sole purpose for their examination of W.B.'s treatment notes was to provide Ms. Partridge and Ms. Snow with information detrimental of W.B. to allow them to respond to his Nursing Board complaint.[22]  *Id.*

---

[19] CMS objects to this statement on the ground that it is immaterial to the issues presented in its motion for summary judgment.  DRPSAMF ¶ 165.  The Court disagrees and overrules CMS's objection.

[20] CMS qualified its response to this statement on the ground that Mr. Halkett had not read W.B.'s Nursing Board complaint and therefore could not know whether the information contained in W.B.'s record would assist their defense of W.B.'s complaint.  DRPSAMF ¶ 166.  The Court overrules CMS's qualified response since CMS elsewhere admits that the nurses would not have the right to review W.B.'s chart to assist in preparing their defense to his complaint.  Furthermore, it is apparent that knowledge of an opponent's psychological background could assist the nurses' defense.

[21] CMS qualified its response to this statement on the ground that it mischaracterizes Ms. Partridge's testimony.  DRPSAMF ¶ 167.  CMS says Ms. Partridge testified that she would have no legitimate need to look at W.B.'s treatment record "in connection with responding to a simple Board of Nursing complaint."  *Id.* (citing *Partridge Dep.* 46:6-8).  Ms. Partridge reviewed Mr. Halkett's inmate notes to evaluate whether his notes contained information sufficient to ensure quality treatment and adequate mental health care.  *Id.* (citing DSMF ¶ 50).  The Court agrees that to the extent PSAMF ¶ 167 proffers that there would be no medical need for Ms. Partridge to examine W.B.'s treatment notes, the statement is not supported by the record, particularly since Mr. Halkett conceded in admitting Defendant's Statement of Material Fact paragraph 50 that Ms. Partridge undertook a review of Mr. Halkett's inmate progress notes to evaluate whether his notes contained information sufficient to ensure quality treatment and adequate mental health care.  DSMF ¶ 50; PRDSMF ¶ 50.

[22] CMS denies this statement of material fact on the ground that Ms. Partridge reviewed the notes to ensure quality treatment and adequate mental health care.  PSAMF ¶ 167; DRPSAMF ¶ 167.  Even if Ms. Partridge had the right to monitor Mr. Halkett's treatment notes, her decision to exercise that right by reviewing the mental health treatment records of an inmate who had filed a complaint

Mr. Halkett raised his concerns with Ms. Partridge and when she failed to respond, he went over her head and on May 8, 2007, sent a letter to David Wilkinson, the Regional Manager of CMS, complaining about the breach of inmate confidentiality by Ms. Partridge and Ms. Snow.[23]  PSAMF ¶ 168; DRPSAMF ¶ 168. Mr. Wilkinson did not respond to Mr. Halkett's letter because he had left CMS for a new position.[24]  PSAMF ¶ 169; DRPSAMF ¶ 169.  When Mr. Wilkinson's replacement, Larry Amberger, was hired, Mr. Halkett sent his May 8, 2007 letter to him.  PSAMF ¶ 169-70; DRPSAMF ¶ 169-70.  In his June 7, 2007, cover letter to Mr. Amberger, Mr. Halkett explained that he was "mainly concerned about any repercussions regarding eval. or annual review, for putting myself in a sort of whistleblower situation."  PSAMF ¶ 170; DRPSAMF ¶ 170.  Mr. Amberger met with Mr. Halkett and told him that Ms. Partridge may have had a "lapse of judgment" in reviewing W.B.'s records but he did not consider it to be unethical or illegal.[25] PSAMF ¶ 171; DRPSAMF ¶ 171.  Mr. Halkett disagreed with Mr. Amberger.  *Id.*

---

against her justifies an inference, viewing the facts in the light most favorable to Mr. Halkett, that she did so to gain an advantage in her defense of the inmate's claim.

[23] CMS objects to this statement on the ground that Mr. Halkett's May 8, 2007, letter is the best evidence of its contents.  DRPSAMF ¶ 168.  The Court overrules CMS's objection.  Mr. Halkett is generally characterizing the letter.  If CMS contended that his characterization was inaccurate, it would be one thing.  But the statements of material fact by their nature shorthand evidence to allow a more narrow focused resolution of the motion.

[24] CMS objects to this statement on the ground that Mr. Wilkerson's failure to respond to his letter is immaterial.  DRPSAMF ¶ 169.  The Court overrules CMS's objection.

[25] CMS posits a qualified response to this statement of material fact, noting that at no time, did Mr. Amberger believe that Ms. Partridge had done anything wrong and that Mr. Amberger does not believe he communicated anything to the contrary to Mr. Halkett.  DRPSAMF ¶ 171.  The Court is required to view the evidence in the light most favorable to Mr. Halkett.

No one within CMS management asked Ms. Partridge whether she had looked at W.B.'s records.[26]  PSAMF ¶ 172; DRPSAMF ¶ 172.

### 6.    Mr. Halkett's July 19, 2007 Complaint

On July 19, 2007, Mr. Halkett wrote another letter to Ms. Partridge complaining that an inmate's counseling records were not being kept confidential as he had seen a caseworker, Carol Geel, take an inmate's chart.[27]  PSAMF ¶ 173; DRPSAMF ¶ 173.  In response, Ms. Partridge informed Mr. Halkett that she had "taken care of this", although she would not go into details.[28]  PSAMF ¶ 174; DRPSAMF ¶ 174.

### 7.    Mr. Halkett's September 14, 2007 Complaint

On September 14, 2007, Mr. Halkett called and left a message for Ms. Partridge about another breach of inmate confidentiality.  PSAMF ¶ 175; DRPSAMF ¶ 175.  He informed Ms. Partridge that the records of an inmate, "F.B.," had been mishandled and that another inmate's records had been included in F.B.'s chart.  PSAMF ¶ 175; DRPSAMF ¶ 175.  When Ms. Partridge did not reply, Mr. Halkett followed up with a memorandum dated September 19, 2007 to Ms. Partridge with copies to Jeff Morin, the Director of the Charleston Correctional Facility (CCF), Judy Bailey, the Unit Manager of CCF, Larry Amberger, the

---

[26] CMS posited a qualified response to this statement of material fact, noting that Ms. Partridge did not recall anyone asking her whether she looked at W.B.'s records.  DRPSAMF ¶ 172.  If Ms. Partridge did not recall anyone in management asking her about whether she looked at W.B.'s records, it is a logical inference that no one in management did ask her about whether she did so.

[27] CMS posited a qualified response to this statement of material fact, explaining that Ms. Geel took inmate H.'s file to make a referral in connection with H.'s application for social security disability. DRPSAMF ¶ 183.  CMS's explanation does not contradict Mr. Halkett's asserted fact.

[28] CMS posited a qualified response to this statement of material fact, explaining that Ms. Partridge had instructed Ms. Geel to have the medical department personnel photocopy the inmate medical records she required in order to obviate the need for her to take records to the copier.  DRPSAMF ¶ 174.  CMS's explanation does not contradict Mr. Halkett's asserted fact.

Regional Director of CMS, and Joe Fitzpatrick, the Director of Mental Health for the Maine Prison System. PSAMF ¶ 175; DRPSAMF ¶ 175. In his September 19, 2010, memorandum, Mr. Halkett stated:

> I have looked through the DOC policy and procedures and can't figure out if transferring notes in this manner is permissible or legal. To that end, the regulations suggest that the Attorney General's Office be appraised of the situation and complete an investigation.

PSAMF ¶ 176; DRPSAMF ¶ 176. On September 27, 2007, Mr. Halkett sent Ms. Partridge a follow-up letter, reiterating that he wanted to talk to her about the confidentiality issue. PSAMF ¶ 177; DRPSALF ¶ 177. Mr. Halkett never did get to speak to Ms. Partridge about these concerns nor did anyone at CMS or DOC address his concerns. PSAMF ¶ 178; DRPSAMF ¶ 178. Although Ms. Partridge may have discussed confidentiality protocols with CMS management after September 19, 2007, she does not recall doing so.[29] PSAMF ¶ 179; DRPSAMF ¶ 179. Ms. Partridge did speak with Jeff Morin about guidelines for sharing information about an inmate's application for community home confinement, but spoke only in generalities and did not address inmate F.B.'s situation. PSAMF ¶ 180; DRPSAMF ¶ 180. Ms. Partridge did not get answers to all of Mr. Halkett's questions and did no further investigation. PSAMF ¶ 180; DRPSAMF ¶ 180.

---

[29] Mr. Halkett's statement of material fact paragraph 179 states that Ms. Partridge "did not have any conversations with CMS management about confidentiality protocols after September 19, 2007." PSAMF ¶ 179. For support, Mr. Halkett cites Ms. Partridge's deposition at page 56. *Id.* CMS posited a qualified response, noting that Ms. Partridge actually stated that she could not recall any such conversations but that she might have had some. DRPSAMF ¶ 179. The Court has reviewed Ms. Partridge's deposition and agrees with CMS that Mr. Halkett's statement of material fact paragraph 179 overstates her testimony and is not supported by the record. The Court has inserted Ms. Partridge's narrower actual testimony.

Ms. Partridge did not investigate how the notes of one inmate ended up in another inmate's chart. PSAMF ¶ 181; DRPSAMF ¶ 181. If a records request had been made, it would have been the responsibility of the on duty nurse to locate and copy records, and that nurse should have discovered the presence of another inmate's notes within the chart.[30] PSAMF ¶ 181; DRPSAMF ¶ 181. Ms. Partridge did not know the name of the on-duty nurse in this case and did not speak to the nurse about her failure to discover the misplaced notes. PSAMF ¶ 181; DRPSAMF ¶ 181. Ms. Partridge never learned whether the inmate applying for home confinement had signed a release for his records. PSAMF ¶ 182; DRPSAMF ¶ 182.

### 8. Mr. Halkett and the Subpoena

On September 18, 2007, Mr. Halkett was served with a subpoena to testify at a trial on behalf of inmate "M.T.," and he provided Ms. Partridge with a copy of the subpoena. PSAMF ¶ 183; DRPSAMF ¶ 183. Ms. Partridge told Mr. Halkett that she would prefer he not testify on behalf of M.T. because it could be problematic for Mr. Halkett and CMS.[31] PSAMF ¶ 184; DRPSAMF ¶ 184.

---

[30] CMS objected to the materiality of this statement and the next statement. DRPSAMF ¶ 181. CMS disputes whether the on duty nurse should have discovered the misplaced note, whether Ms. Partridge knew who was on duty, and whether Ms. Partridge spoke to the nurse are material to the determination of the pending motion for summary judgment. *Id.* The Court overrules CMS's objection. The statements are material as to whether Mr. Halkett's complaints could have provoked CMS's allegedly retaliatory response.

[31] CMS posited a qualified response, saying that the statement mischaracterizes Ms. Partridge's testimony. DRPSAMF ¶ 184. It says Ms. Partridge testified that she never discouraged Mr. Halkett from testifying and never told him he should not testify. *Id.* She realized that he had to respond to the subpoena. *Id.* She recalled a conversation in 2006 in which she mentioned that it can cause problems when a CMS employee testifies voluntarily for an inmate, but she said that this conversation was not directed to Mr. Halkett's response to the 2007 subpoena. *Id.* CMS cites Ms. Partridge's testimony. *Id.* The problem is that this statement of material fact is supported by Mr. Halkett's testimony. *Halkett Dep.* 235:19-25; 236:1. Furthermore, Mr. Halkett says that Ms. Partridge may have told him this in 2006. *Id.* The Court is required to view the evidence in the light most favorable to Mr. Halkett.

## 9. Mr. Halkett and W.B.'s Lawsuit Against CMS

On November 16, 2007, Mr. Halkett received a telephone call from Chris Taintor, a lawyer representing CMS in a lawsuit brought by inmate "W.B." PSAMF ¶ 185; DRPSAMF ¶ 185. Attorney Taintor told Mr. Halkett that he was aware W.B. had designated Mr. Halkett as an expert witness and he asked Mr. Halkett whether there would be any surprises. PSAMF ¶ 185; DRPSAMF ¶ 185. Mr. Halkett told Mr. Taintor that he would have to be truthful about what he thought of Ms. Partridge's and Ms. Snow's callousness over W.B.'s mental health notes, and Mr. Taintor responded that CMS did not penalize so-called whistleblowers and he was glad to hear that Mr. Halkett liked his job.[32] PSAMF ¶ 186; DRPSAMF ¶ 186.

## E. The Parties' Positions

### 1. CMS's Argument

CMS first contends that Mr. Halkett failed to satisfy the *prima facie* elements of a MWPA claim. *Def.'s Mot.* at 9-14. It says that Mr. Halkett cannot demonstrate that he engaged in protected activity or that there was a causal connection between the activity and his termination. *Id.* at 10. Focusing on the definition of protected activity in 26 M.R.S. § 833(1)(A) and (B), CMS says that Mr. Halkett's complaints to

---

[32] The next statement of material fact asserts that when Ms. Partridge was asked at her deposition whether CMS's attorney Chris Taintor had told her that Mr. Halkett had been designated by W.B. as an expert witness, CMS invoked the attorney-client privilege and instructed her not to answer. PSAMF ¶ 187. CMS objects on the ground that the assertion of the attorney-client privilege does not entitle Mr. Halkett to a negative inference for purposes of ruling on the motion for summary judgment. DRPSAMF ¶ 187.

Neither party's position is supported by the record. Although at one point the question is objected to, *Partridge Dep.* 62:9-15, later during her deposition, Ms. Partridge effectively answered the question:

> Q. And you were aware that he (Mr. Halkett) had been designated as an expert witness by W.B. in the civil action brought against you and CMS?
> A. I don't recall if I remember being told that or not.

*Id.* 73:19-22.

CMS do not survive a "reasonableness" inquiry. *Id.* at 11. CMS insists that Mr. Halkett failed to identify any state or federal law, rule or regulation that CMS supposedly violated. *Id.* at 11-12. Even if Mr. Halkett held a subjective belief that CMS was violating the law, CMS says that to present a *prima facie* case in a MWPA claim, the employee must satisfy an objective component for the reasonableness of his belief. *Id.* at 11-14. It concludes that Mr. Halkett's belief cannot be deemed both subjectively and objectively reasonable. *Id.*

CMS contends that, even if Mr. Halkett survives the protected activity element of his MWPA claim, he has failed to present evidence that would satisfy his burden to establish a causal connection between his protected activity and his termination. *Id.* at 14-17. CMS says that of Mr. Halkett's four complaints, only two occurred within three months of his termination and the other two were "quite attenuated in time." *Id.* at 15. Even as to the latter two instances, CMS claims that "[n]either . . . provide the type of immediate temporal proximity which, standing alone, would be 'strongly suggestive' of retaliation." *Id.* Furthermore, CMS asserts that Mr. Halkett's September 19, 2007, "broadside" was too vague to credit as the cause of his dismissal, especially in light of his serious violation of the CMS prisoner telephone policy. *Id.* at 16.

CMS says that, should the Court conclude that Mr. Halkett has sustained his *prima facie* case, it should also conclude that CMS has met the *McDonnell Douglas* burden to present a non-retaliatory reason for his termination. *Id.* at 17-18. As

proof, CMS cites the facts surrounding Mr. Halkett's allowance of inmate phone calls from his office. *Id.*

CMS turns then to the final question: whether Mr. Halkett has presented sufficient evidence from which a jury could find that CMS's termination was pretextual. *Id.* at 18-20. CMS observes that the First Circuit has cautioned that the courts do not act "as super personnel departments, assessing the merits—or even rationality—of employers' nondiscriminatory business decisions." *Id.* at 19 (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)). Contrasting this case with those where employees have withstood dispositive motions, CMS emphasizes that there is no evidence that Ms. Partridge ever made retaliatory comments, that Mr. Halkett was treated differently from other similarly-situated employees, or that CMS had engaged in a pattern or practice of retaliation. *Id.*

## 2.     Mr. Halkett's Response

Mr. Halkett first observes that CMS failed to address 26 M.R.S. § 833(1)(C), which extends the scope of protected activity to an employee's participation in an investigation, hearing or inquiry held by that public body or in a court action. *Pl.'s Opp'n* at 8-9. He contends that he was required to respond to the subpoena and testify on behalf of inmate M.T. and was designated as an expert witness by inmate W.B. and that his participation in those activities is protected conduct under section 833(1)(C). *Id.*

Regarding his complaints about confidentiality violations, Mr. Halkett says that the question is not whether the violations were in fact illegal but whether a reasonable person might have believed the practices were illegal. *Id.* at 9. Mr.

22

Halkett goes on to assert that he was not merely reasonable in believing that the five instances of confidentiality breaches were illegal, "he was right." *Id.* at 11.

Addressing the causation issue, Mr. Halkett stresses that the question is whether there is sufficient evidence in this record to permit a factfinder to find that "there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." *Id.* at 12. Finally, as regards his ultimate burden of proof, Mr. Halkett says that the temporal closeness of his protected activity and termination, the weaknesses, inconsistencies and contradictions in CMS's explanations, its failure to follow its progressive discipline policy, and its decision to allow the person against whom Mr. Halkett had complained to make the termination decision creates a factual question that can only be resolved by a factfinder. *Id.* at 11-20.

### 3. CMS's Reply

In its Reply, CMS disputes much of what Mr. Halkett contended in his Response. CMS begins with the facts, challenging Mr. Halkett's characterization of the events surrounding the handling of inmate treatment records and concluding that Mr. Halkett's argument requires the Court to "ignore the relationship between the inmates whose records were at issue and the specific duties of the employees who were in possession of those records." *Def.'s Reply* at 2-4. CMS then explains why the records were accessed. *Id.*

CMS next observes that Mr. Halkett's attempts to provide legal authority for his view of inmate confidentiality failed to account for (or even cite) the Maine statute that specifically addresses confidentiality among inmates: 34-A M.R.S. §

1216(1)(B).  *Id.* at 4-5.  CMS says that a review of section 1216(1)(B) confirms that Mr. Halkett's belief that CMS had violated laws protecting inmate confidentiality was simply incorrect.  *Id.* at 5.  It also says that Mr. Halkett's assumptions about HIPPA[33] privacy rules were not reasonable.  *Id.* at 5-6.

CMS disputes Mr. Halkett's rendition of the facts in this case.  First, it recites the facts which, according to CMS, preclude an inference of pretext or animus by CMS.  *Id.* at 6-9.  Second, it emphasizes the facts supposedly discrediting Mr. Halkett's judgment, specifically his view that C.M. was not a perpetrator of domestic violence.  *Id.* at 10.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).[34]  For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law."  *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted).  "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment."  *Carroll v.*

---

[33] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936.
[34] On December 1, 2010, while this motion was pending, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective.  *See Farmers Ins. Exch. v. RNK, Inc.*, No. 09-2524. 2011 U.S. App. LEXIS 1255, at *8 n.4 (1st Cir. Jan. 21, 2011).  Applying the amended version of Rule 56 to this case is "just and practicable" and would not "work a manifest injustice" because the amendments "do not change the summary judgment standard or burdens."  *Id.*

*Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (citation and internal quotation marks omitted).

### B.  Maine Whistleblower Protection Act

To prevail on her MWPA claim, Ms. Gammon must prove three elements: "(1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and, (3) there was a causal link between the protected activity and the adverse employment action." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053.

The MWPA analysis is guided by federal case law construing analogous statutes. *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶12, 915 A.2d 400, 404; *see also Maine Human Rights Comm'n. v. City of Auburn*, 408 A.2d 1253, 1261 ("[A]s we have previously held, the Maine legislature by adopting provisions that generally track the federal antidiscrimination statutes intended the courts to look to the federal case law to provide significant guidance in the construction of our statute." (internal quotation marks omitted)).  Specifically, the statutory scheme follows "the shifting burdens analysis described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 19, 909 A.2d 629, 635-36.  Pursuant to that analysis, if the plaintiff can establish a temporal relationship between the protected activity and the adverse employment action, "the employer, then, will be required to produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action." *Id.* (quoting *DiCentes v. Michaud*, 1998 ME 227, ¶ 16, 719 A.2d 509, 515). "The final burden to prove the existence of the causal nexus remains with the

plaintiff." *Id.* (citing *DiCentes*, 1998 ME 227, ¶ 16, 719 A.2d at 515). "[A] plaintiff can meet [this] final burden and survive a defense motion for a summary judgment by establishing a factual dispute as to whether a causal connections exists between the report protected by the [M]WPA and the adverse employment action." *Stanley v. Hancock Cty. Comm'rs.*, 2004 ME 157, ¶ 24, 864 A.2d 169, 177.

### C.    *Prima Facie* Case

The First Circuit has explained that "[u]nder the MWPA, the complained-of conduct need not *actually* be illegal, but the employee must prove that a reasonable person might have believed that it was." *Tripp v. Cole*, 425 F.3d 5, 9, (1st Cir. 2005) (emphasis in original) (internal punctuation and citation omitted); *accord Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 155 (Me. 1991). Armed with this understanding of the MWPA, the Court considers the reasonableness of Mr. Halkett's beliefs in the violations of inmate confidentiality.

The Court turns first to the statutory language and whether a reasonable person might have believed there were ongoing violations of inmate confidentiality. Assuming that CMS is correct that the applicable Maine statute regarding an inmate's right of confidentiality is 34-A M.R.S. § 1216(1)(B), this statute does not eliminate the individual right of confidentiality because he is an inmate. To the contrary, the Maine statute begins with the premise that inmate records are confidential. 34-A M.R.S. § 1216(1)(B) (providing that "[a]ll . . . medical . . . records . . . and facts contained in them, pertaining to any person receiving services from the department must be kept confidential and may not be disclosed to any person"). The statute allows for the disclosure of medical and other records "[t]o any state

agency if necessary to carry out the statutory functions of the agency." 34-A M.R.S. § 1216(1)(B).

Mr. Halkett's complaints to CMS about misfiled and missing mental health care notes raised questions about whether CMS was complying with its statutory obligation as a contracting agency to the DOC under Maine law to protect inmate confidentiality. *See id.* Furthermore, if Ms. Partridge and Ms. Snow accessed an inmate's chart in order to obtain confidential information to assist them in their defense of a complaint the inmate had filed against them before the Board of Nursing, their access to the inmate chart would not have been consistent with accessing the records to perform "the statutory functions" of the DOC and its contractors. *Id.*

The Maine Supreme Judicial Court has stated that "if a Maine employee reports a suspected violation of federal law to his employer in compliance with the Act, he is protected by the Act." *Bard*, 590 A.2d at 156. The same applies to suspected violations of state law. *Tripp*, 425 F.3d at 9 (observing that the employee contended that the employer had violated a Maine statute). Here, the Court concludes—even accepting the DOC's position as to the applicable Maine statute— that the facts viewed in the light most favorable to Mr. Halkett show he had a "reasonable belief" that CMS's handling of confidential inmate records had "cross[ed] the line" and that he had "communicated that belief to his employer in good faith." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261-62 (1st Cir. 1999).

The Court also finds that there are sufficient facts from which a jury could reasonably perceive a temporal relationship between Mr. Halkett's complaints and his dismissal. His last complaint about breaches of inmate confidentiality took place on September 19, 2007; he was terminated on December 7, 2007—less than three months later. The First Circuit has stated, in addressing analogous retaliation claims, that "temporal proximity alone can suffice to meet the relatively light burden of establishing a *prima facie* case of retaliation." *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (internal punctuation and citation omitted). A gap of about two and a half months suffices. *See Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007) (concluding that the "'temporal proximity' between appellant's allegations of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a prima facie case of retaliation"). In addition, Mr. Halkett claims that his frank disclosure to CMS Attorney Taintor on November 16, 2007, where he stated he would have to be honest about what he thought of Ms. Partridge and Ms. Snow, fell within one month of his termination. *See Venable v. T-Mobile USA, Inc.*, 603 F. Supp. 2d 211, 219 (D. Me. 2010) (finding a termination less than thirty days after an event sufficient to sustain *prima facie* burden); *Speckin v. Nestle Waters N. Am. Inc.*, No. 08-149-P-S, 2009 U.S. Dist. LEXIS 14893, at *35-36 (D. Me. Feb. 24, 2009) (a two to three month interval is sufficient), *affirmed by* 08-149-P-S, 2009 U.S. Dist. LEXIS 30240 *11 (D. Me. Apr. 2, 2009); *Rhoades v. Camden Nat'l Corp.*, 575 F. Supp. 2d 260, 262 (D. Me. 2008) (approximately one month). *See also*

*Deslauriers v. Chertoff*, No. 07-184-B-W, 2009 U.S. Dist. LEXIS 33123 *92-94 (D. Me. Apr. 16, 2009) (reviewing a number of holdings concerning temporal proximity).

### D.     Non-retaliatory Basis for Termination

Under the *McDonnell Douglas* burden-shifting framework, CMS has the burden of "articulating a legitimate, nondiscriminatory reason for the adverse employment decision." *Mesnick*, 950 F.2d at 823.  CMS has amply sustained its burden, and Mr. Halkett does not argue it has not.

### E.     Pretext

"At the final stage, the plaintiff is required to show, unassisted by the original inference of discrimination, that the employer's preferred reason is actually a pretext for discrimination of the type alleged." *Id.* at 823-24.  In *DeCaire v. Mukasey*, the First Circuit explained the plaintiff's burden of proof at this final stage: "it is permissible for a trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's discrimination." 530 F.3d at 19. (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).  A plaintiff is not required to produce direct evidence of pretext and may rely on circumstantial evidence to make his case. *Id.* at 20.  In *Collazo v. Bristol-Myers Squibb Mfg.*, 617 F.3d 39, 50 (1st Cir. 2010), the First Circuit reiterated that to withstand summary judgment, a plaintiff need not "prove by a preponderance of the additional evidence that [retaliation] was in fact the motive for the action taken.  All a plaintiff has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action." (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)).

CMS's arguments may eventually carry the day before a jury; Mr. Halkett's stubborn repetitive violation of CMS and DOC policies regarding telephone contact by prisoners with those on the outside may well have been sufficient grounds to terminate him.[35]  Furthermore, as CMS points out, there is no evidence of retaliatory comments by Ms. Partridge, the person who made the termination decision.  *Def.'s Mot.* at 19.  However, the Court finds sufficient issues of material fact to justify allowing this case to proceed to jury.

As an initial matter, CMS's contention that there is no evidence that it treated Mr. Halkett differently than other similarly situated employees is disputed. *Id.*  Mr. Halkett alleges that Patty Murphy, a Washington County Psychotherapy Associates employee who worked with DCF inmates, allowed inmates to make telephone calls, but there was no evidence she had been disciplined.  Furthermore, CMS's decision to terminate Mr. Halkett, rather than to apply progressive discipline, suggests that it treated him differently than typical employees.

Moreover, a factfinder could infer that CMS's termination was pretextual based upon the number, frequency and nature of Mr. Halkett's complaints preceding his termination.  Mr. Halkett's September 19, 2007 complaint was only the latest in a string of similar complaints, repeatedly accusing his fellow workers

---

[35] In its Reply, CMS says that the criminal records attached to Ms. Geel's affidavit confirm that Mr. Halkett allowed C.M. to contact the same person against whom he had committed a domestic assault.  *Def.'s Reply* at 10.  The Court admits to some confusion.  According to the records, a Washington County Grand Jury indicted C.M. on August 5, 2004 for assault—a violation of 17-A M.R.S. § 207(1)—and on September 28, 2004, C.M. was found guilty of violating 17-A M.R.S. § 207(1)(B).  Section 207(1)(B), however, deals with an assault by someone who is at least 18 against someone who is less than 6 years old.  17-A M.R.S. § 207(1)(B).  CMS seems to assume that the domestic assault was against C.M.'s girlfriend and that Mr. Halkett was allowing C.M. to telephone the victim of the crime.  However, it appears based on the docket sheet that C.M. was found guilty of assaulting a young child, not his girlfriend.

and supervisor of confidentiality violations and documenting potential violations of law and regulation. Mr. Halkett's punctiliousness in applying rules against others stands in marked contrast to his refusal to obey rules himself. A jury could reasonably conclude that CMS simply had enough of Mr. Halkett and his constant complaining.

CMS also emphasizes the context within which Mr. Halkett's confidentiality complaints occurred. According to CMS, all the persons who allegedly violated inmate confidentiality were involved with inmate care since they were employees at either CMS or DOC. CMS reasons that they must have, therefore, acted in accordance DOC policy. *Def.'s Reply* at 3-4. This point goes to the reasonableness of Mr. Halkett's complaints. However, the legal standard is not whether the activity was actually illegal but whether a reasonable person might have believed the activity was illegal. *Tripp*, 425 F.3d at 9. Moreover, if Ms. Partridge and Ms. Snow had reviewed an inmate's file to obtain information to defend a pending complaint, CMS must concede that this access would not have been appropriate and would cause a reasonable person to believe that a violation might have occurred.

Taken as a whole, the Court concludes that Mr. Halkett has raised genuine issues of material fact. The sum of Mr. Halkett's evidence is:

1)    He had repeatedly complained to CMS about its lax and, in his view, unlawful procedures concerning inmate records;

2)    He had complained six times about CMS's procedures over a span of a little more than one year;

3) He had complained that his supervisor and another nurse had violated confidentiality laws;

4) He was subpoenaed by inmates to testify against his supervisor and the other nurse;

5) He had informed CMS's attorney that he intended to tell the truth about his supervisor and the nurse;

6) The supervisor about whom Mr. Halkett had complained and about whom he was about to testify was the person who decided to terminate him;

7) CMS failed to use progressive discipline against Mr. Halkett; and,

8) Mr. Halkett's last complaint about confidentiality was on September 19, 2007, his conversation with the CMS attorney was on November 16, 2007, and he was terminated on December 7, 2007.

These factors, taken together and viewed in the light most favorable to Mr. Halkett, are sufficient to withstand summary judgment.

## III. CONCLUSION

The Court DENIES Correctional Medical Services, Inc.'s Motion for Summary Judgment (Docket # 16).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 4th day of February, 2011